this time that they saw several players from the Argentinean soccer team moving about the Hotel.

34. After dinner and gambling all plaintiffs exited the hotel to obtain taxis to take them to the game. The taxis were waiting outside of the Hotel.

35. At approximately 1:45 a.m. on November 19, 2013 the plaintiffs along with 4 other individuals returned to the Hotel.

36. That Plaintiffs walked into the Hotel lobby and then took the elevator to the Casino.

37. That Four out the five persons the plaintiffs were with were wearing Bosnian National Soccer Team paraphernalia or sportswear, including but not limited to scarves with team logos, Bosnian flags and jerseys on them.

38. That when the Plaintiffs reached the Casino floor the group split into two as they exited the elevator.

39. That upon exiting the aforesaid elevator Plaintiffs walked down a corridor/hallway in order to reach the entrance of the Casino.

40. That plaintiffs split of into pairs with Plaintiff ADIS and another individual, upon information and belief known as EDI RADONCIC, his cousin, were walking in front, while SALKO and HALIL walked a few feet behind them.

41. That plaintiff ADIS was wearing a Bosnian Team scarf and Bosnian Flag draped over his shoulders while EDI RADONCIC was wearing an Argentinean National Soccer Team Jersey.

42. That the plaintiffs walked down the corridor/hallway and then reached the entrance to the Casino.

43. That the Casino entrance was manned by defendant TROOPER COLLINS aka

BARBARA COLLINS (hereinafter Defendant COLLINS), who upon information and belief and all relevant times was a Missouri State Trooper working at the aforesaid defendant Casino Lumiere Place.

44. Defendant COLLINS, upon information and belief is a Caucasian female security agent, approximately 5'10", with medium athletic build, was wearing a black blazer and flanked and supported by defendant Casino employees JOHN DOES# 1 and 2 respectively, two large male agents, one black the other white, both of whom were wearing uniform red blazers and black pants.

45. That when the plaintiffs reached the casino entrance, Plaintiff SALKO showed the security agents his drivers ID, and he along with his friend EDI, who was wearing the Argentinean Team jersey, were allowed to go through the turnstiles positioned at the entrance of the Casino controlling entrance into the gaming area thereat.

46. That after plaintiff SALKO and his friend EDI were admitted into the gaming area of the Casino they waited on the other side of the turnstiles as the rest of their party, including Plaintiff's ADIS and HALIL approached the aforesaid security detail at the entrance of the Casino thereat.

47. That suddenly, merely seconds after Plaintiff SALKO was admitted into the Casino, and without any provocation, basis, action or reason on the part of or by the Plaintiffs, defendant COLLINS, stopped plaintiff ADIS from entering the Casino and verbally refused him entry.

48. That when Plaintiff ADIS asked defendant COLLINS why she had stopped him she stated among other things that she deemed Plaintiffs ADIS a "trespasser".

49. That almost as suddenly, upon refusing Plaintiff ADIS entry into the Casino, defendant COLLINS turned around and faced Plaintiff SALKO who was standing inside the

Casino a few feet away from the turnstiles and entrance thereat.

50. That defendant COLLINS, again without any reasonable basis, justification or provocation on the part of or by Plaintiff SALKO, examined Plaintiff SALKO's attire, including but not limited to the fact that he was wearing Bosnian National Soccer Team paraphernalia on his person, and demanded that he exit the Casino.

51. That said defendant COLLINS did not demand that EDI, who was wearing an Argentinean Team jersey and who had entered together with plaintiff SALKO, leave the Casino.

52. That as plaintiff SALKO walked toward defendant COLLINS from inside the Casino, plaintiff ADIS who was standing at the entrance of the Casino, immediately facing defendant COLLINS who was flanked by defendant JOHN DOES #1 and 2, repeatedly requested and asked defendant COLLINS to explain to him why he was being denied entry into the Casino.

53. That defendant COLLINS refused to explain herself and continued to demand that plaintiffs leave the Casino area.

54. That plaintiff SALKO together with plaintiff ADIS and HALIL continued to aks defendant COLLINS for an explanation even as they complied with her demand and began exiting the casino.

55. That at some point when plaintiffs, who were complying with defendant COLLINS demand and had walked away from the entrance to the gaming area of the Casino and were now all gathered at the opening to the hallway that led away from the Casino to the elevators and exits, Plaintiff ADIS attempted to speak to the female security agent again.

56. That at this time, again without any hostile or violent action taken by any plaintiffs and without any justification or basis in fact, defendant COLLINS stated to wit, "that's it" and lunged at Plaintiff ADIS punching him in the face and nose bringing him to the ground.

57. That the other security agents defendant JOHN DOES #1 and 2 seeing defendant COLLINS attack plaintiff ADIS jumped in as well and began to strike plaintiff ADIS about his body with punches and kicks.

58. That even though defendant ADIS did not resist and or fight back, he was tasered several times by one or all of the defendant security guards.

59. That upon tasering plaintiff ADIS, the defendant security guards placed his arms behind him while he was on the floor and handcuffed him.

60. That Plaintiffs SALKO and HALIL were shocked by what was happening to Plaintiff ADIS and stood on, paralyzed as they saw him being tasered and beaten.

61. That while Plaintiff ADIS was being handcuffed, several more defendant security agents, all males, upon information and belief all Caucasians, and all wearing similar red jackets and black pants, JOHN DOES#4-6, appeared on the scene and turned on Plaintiff HALIL.

62. That said defendant JOHN DOES#4-6 did attack Plaintiff HALIL, striking him about his body and person and force him to the ground whereupon they placed him in handcuffs.

63. After placing Plaintiffs ADIS and HALIL on the floor and into handcuffs defendants COLLINS and JOHN DOES#1-6 turned to Plaintiff SALKO who had been standing, unmoving to the side while Plaintiff ADIS and HALIL were being beaten.

64. That, at this moment Plaintiff SALKO advised defendant security personnel that he had recently had back surgery and that it would be harmful to him if they put him on the floor and handcuff him from the back.

65. That further, both Plaintiffs ADIS and HALIL also advised the security personnel to avoid putting Plaintiff SALKO on the floor and cuffing him.

66. That notwithstanding the multiple warnings, defendant COLLINS, the aforesaid

defendant female security and the other defendants employees JOHN DOES#1-6 said they didn't care and Plaintiff SALKO was summarily grabbed by three defendant employee security agents, one black and the other two white.

67. That despite posing no threat and offering no resistance defendant employees threw Plaintiff to the floor and one or more defendant security agent climbed onto his back.

68. That even as Plaintiff SALKO was going down, he told them "please guys be careful how your are going to put me down I have surgery"

69. That once on the ground Plaintiff SALKO began to start feeling pain in his lower back where he had the surgery. Upon handcuffing he was then made to stand up. As he got up the felt a sharp pain and constrictions in his neck.

70. That after cuffing Plaintiffs defendant employees frog marched them into their security office where they were held in handcuffs, denied water, ridiculed and humiliated for several hours.

71. That while Plaintiff SALKO and ADIS were in handcuffs and detained in defendant employees security office they complained of pain to their back, neck, face and nose respectively and requested that they be allowed to go to the hospital.

72. That defendant security agents including but not limited to defendant COLLINS refused to call an ambulance for over an hour and half after Plaintiffs first requested it.

73. That the aforesaid defendant security personnel took Plaintiffs room keys and told them that they could not could not use the room.

74. That as a result of the injuries sustained in the attack upon their persons Plaintiffs SALKO and ADIS were taken to the hospital.

75. That at all relevant times both Plaintiffs SALKO, ADIS and HALIL were wrongfully,

without cause, right, justification or provocation struck, assaulted, battered, abused about their persons by these defendant(s) COLLINS and JOHN DOES#1-6 who then forcibly and unlawfully ejected same from said defendant FOUR SEASONS HOTEL where they were all lawful paying customers.

76. That defendant COLLINS never asked whether Plaintiffs were guests of defendant FOUR SEASONS HOTEL even though a large contingency of fans of the Bosnian National Soccer Team wearing Bosnian Soccer Team paraphernalia were checked into the hotel, had been gambling in the casino early that evening and had eaten in the Hotel Restaurant adjoining the Casino.

77. That upon information and belief and at all relevant times hereinafter defendant COLLINS, as a Missouri State Trooper and Missouri Gaming Commission Agent on duty at the Defendant Casino was aware that a soccer match between the Argentinean National Soccer Team and the Bosnian National Soccer Team had been played that evening at Busch Stadium in St Louis and thus had a reasonable anticipation that both Argentinean Team fans and Bosnian Team fans, some of whom were staying at the Four Seasons Hotel, would seek to enter the Casino to gamble after the game.

78. That upon information and belief defendant COLLINS, being a Missouri State Trooper had working knowledge and or apprehensions of the local St Louis Bosnian Community whom she perceived as violent, unruly and disruptive, feared, would seek to confront and fight with Argentinean National Soccer Team Fans.

79. That upon information and belief defendant COLLINS together with defendants JOHN DOES# 1-6 were unreasonably fearful of conflict between Argentinean Team Fans and Bosnian Team Fans and because of existing perceptions of the local St Louis Bosnian population